The errors which Chuck Hall has brought for your consideration must be considered in context and the context is that the penalty phase case about Chuck Hall was a closed one. And I'm not talking about the case about guilt. Chuck Hall confessed his guilt initially, persistently, and consistently throughout the matter. What I'm talking about is that there is a closed case as to life or death. The jury note that came eight hours into the deliberation basically registered the jury's collective opinion that the case between life and death was closed. And the Tenth Circuit has held that a case is closed if you've got a supplemental instruction that has to be given. But putting it another way, even with the advantages of the errors that we're talking about that were given to the government, the government's case was not a strong one. Start out with their point about heinousness of the crime. The government alleged that there was heinousness because of serious physical abuse and also what ended up happening was that they relied on torture and essentially torture from strangulation. Emphasis is put on the fact that Chuck Hall strangled the victim by standing on his neck for ten minutes. But both of the pathologists who testified said that it was likely that consciousness would have been lost in about a minute and both of the pathologists confirmed that death would have occurred in about three to five minutes. Now I thought there was a dispute about that, that there was some medical testimony that suggested it could be up to four or five minutes. That's why I said three to five minutes. I see. Well, in terms of consciousness, though, that he could have... No, no, no. Okay. Here's what the thought was, and you track and write in terms of, well, did he let off his foot? Did he put it back on? Did he let off his foot? Did he put it back on? But when it came down to really putting even the government's expert to the point, it basically said if you've got the compression for a period of time that's on there, that you're going to lose consciousness within about a minute just because of the lack of flow of oxygen to the brain. What about the stomping, though? I mean, when you get at the evidence of heinousness, I agree that not every strangulation case is going to qualify as heinous. That's clear. Right. But here you have multiple injuries to multiple parts of the body, but in particular, serious injuries to the neck because of stomping on his neck area, which seems to me to be pretty close to torturous, if indifferent. Well, and, Judge, what it's... You read the transcript just like I heard it and read it, but it seemed to me that what the experts were saying is that everything that happened can be associated with just the compression that, I mean, you're talking about a guy who's laying on the floor and you're standing on his neck. Every one of the injuries has to do with that compression and what's happening because of that compression. So in terms of anything that would not be associated with that, for example, the punch in the stomach is talked about. There's no injury to the body on that. Literally every injury to the body has to do with the strangulation compression. Take a look at every one of the injuries. That's what it's associated with. But we have that issue about the sufficiency of this, but gosh, isn't that a close case compared to the kinds of injuries, the kinds of things that come from heinousness cases where you got hundreds of stab wounds, lots of bleeding, blood strewn across the room where this is all happening. My point here that I'm trying to emphasize in coming to what I feel are my two most critical issues that I'd like to talk to you about in the 30 minutes is that this is a close case. Even if you've got the... Counsel, isn't there also evidence in the record that there may have been mental torture in terms of the blindfolding and gagging of the victim prior to the killing? Judge, you could look at it that way, yes. I don't think you can take away that. But the indication is that the blindfolding and gagging immediately precede the stepping on the throat. So it's not a matter of he's left there. For example, the cases where the bodies or the live victims are thrown into trunks and they're driven into different places and they have an extended period of time they have to think about it. This is boom, boom, boom, boom, I think is what the fair reading of the testimony is. But again, Judge, we're talking about if you compare that to other kinds of cases, this is a close case. This jury found that this is a close case. The Hallmark cases in this area are much more serious. Then you go to the whole idea of future dangerousness. We've got the government is alleging that Chuck Hall was a future danger. I've got three different arguments that I'm making to you all. One asks you to look again at the Jurek and Barefoot ideas in light of 90% of the results of future dangerousness findings end up being that the inmates did not pose future dangers. That's what the studies have said. But then you also have the fact that the statute does not permit for an aggravating factor to be proven by any less than beyond a reasonable doubt. But what you've got here is an aggravating factor that can't be proven beyond a reasonable doubt. It's an aggravating factor that can only be proven by what amounts to a preponderance of the evidence. The argument is make, well, courts make these decisions all the time. Yeah, by a preponderance of the evidence standard. In non-capital sentence. Juries make them all the time. It's beyond a reasonable doubt. Mens rea decisions. Future dangerousness? No, no, no, no. Other issues. I mean, you say future dangerousness cannot be proved beyond a reasonable doubt because it's subjective. No, because it's one of those things. It is by nature a preponderance finding. That's my point. And it is not future dangerousness is a preponderance finding. It's more likely that they're going to. I disagree. Interesting. You mean if a defendant takes a stand and says I killed and I will kill tomorrow and I will keep killing until you do something with me, a jury could not find beyond a reasonable doubt that that person is future dangerous? Judge, the whole idea is it's a prediction. What you're doing is you're layering. Can they find it beyond a reasonable doubt that he's more likely than not to be a danger? Yeah, I guess that's the whole idea. I mean, you've hit the nail right on the head, which is you're layering. And I don't think that that's a proper way. I don't think that's what the FDPA. The case law is just against that. I mean, it's a recognized aggravating factor, isn't it? Judge, it is a recognized aggravating factor under Jurek and under Barefoot and all of that, but not under the FDPA with the arguments that we're bringing forward, do you? So this is entirely a statutory argument? Absolutely. Well, Judge, I've made a constitutional argument. Yeah, I thought so. Separately made a statutory argument that it does not qualify under what an aggravating factor should be. What the government is claiming is that any aggravating factor can be brought forward, but they bring to us the argument against our proportionality point that you can't use any mitigating factor, even though any mitigating factor is an overarching term with multiple examples under it. Under any aggravating factor, that is a point that is made in a lesser, is basically the last of 16 alternatives of aggravating factors. And so what you have is the future dangerousness just, it does not qualify under the FDPA. Well, let me ask you, let me follow up on that point, which is you seem to be making the point, and I might be misunderstanding and I'm not quite following, but that future dangerous, as Judge Loken mentioned, under the case law, it's recognized and it could be used as an aggravating factor. We agree on that under the constitution. But you're making the point that under the statute, it can't be because it's not predictive. Wouldn't that same argument apply equally to the recognition of it under the constitution as an aggravating factor? In other words, if it could be proven beyond a reasonable doubt under the constitution, why can't it be proven beyond a reasonable doubt under the statute? Maybe I'm not following you. And Judge, the idea is that you don't necessarily have, see, this comes to the whole decision about death, life and death, it is not, the decision about life and death under the various constitutionally accepted schemes don't necessarily require a determination beyond a reasonable doubt as to the determination between life and death. But specifically, the FDPA requires a determination of beyond a reasonable doubt. I mean, it's in there. So, I mean, that's the distinction on that. Again, I disagree that it's a legitimate one under the constitution. But it's clearly not a legitimate one under the FDPA. But then you get to the whole thing of how lame the evidence was in terms of the future dangerousness. And I concede Judge Loken's point. You know, if you say, I'm going to kill, and I'm going to kill again, and I'm going to kill again, what happens when you don't do it? How about Chuck Hall's convictions for threatening a judge with all kinds of terrible language and a bunch of letters that he writes from inside a jail cell, from turning the airport in Maine upside down because somebody gave him a telephone and gave him a telephone book to be able to call all kinds of people. You know, those are his convictions. And essentially, what you've got are cases, admittedly from district courts, but basically that threats really aren't future dangerousness. They aren't indicative of future dangerousness. And Judge Loken, I get. I listened to all of that stuff. I heard it over and over and over and over and over again. But the guy just doesn't do it. He's got four years at the time of trial that he doesn't even have a write-up for, you know, blowing his nose at the wrong time. So my point here, again, is that this is a close case in the context. Then you go to the idea of lack of remorse. And you have this as a duplicative aggravator that's used both supposedly in support of future dangerousness and as a standalone. I realize that we have the Perkey case, my case, that the court has decided that the instructions take care of that. But there's a clear circuit split about that issue. But let's take a look at the strength of that argument. You have the victim's sister who came in and testified that Chuck Hall wrote her a letter apologizing for what had happened, that she had been moved by the letter, and that she forgave him. That's in opposition to the idea of lack of remorse. Grave indifference to human life. Again, it's a duplication of an intent factor. And the FDPA says that you're not supposed to use an intent factor as a factor for the weighing of aggravating and mitigating factors. And then, as I said, if I got time later, which I probably won't, we could talk about us not being allowed to use the proportionality factor for the jury to consider. Counsel, I wanted to ask you about the duplication point you made on intent. And actually, the government doesn't make this argument. But there are statutory aggravating factors, ones that are actually listed, that incorporate the defendant's intent, or arguably incorporate the defendant's intent. And in particular, knowingly creating a grave risk of death to one or more persons in addition to the victim. If your argument is right, then that shouldn't be there. In other words, they've already said you can duplicate intent. But it's not just the intent, Judge. If it was just the intent, and literally, this is just intent on the part of the recklessness, the grave indifference to human life. It's a generality. You're talking about intent that is followed up by specific sets of circumstances, that you're putting more than one person into danger. It's that combination of things that doesn't really make it an intent. It makes it a whole combination of factors. So it has to be intent plus something else, in your view? Yes. Okay. That would be the distinction that I would see. But the whole reason I'm making these points, which I think are strong, and I love them, and if I had more time, I'd talk about them even more, is to make my point that this is a closed case, to talk to you about two issues. First one is one that's been before this court. Now, by my counting and my using it, this is the fourth time. And that's the instructional error. Basically, this court has said that if aggravating factors outweigh mitigating factors, to justify a sentence of death, then there must be a death penalty imposed. The jury is instructed in that fashion. And that's the way that the model instructions are done. And that's the way that all of the cases are done in this circuit. But that's the infinitesimally minority position on the subject throughout the country. Now, in the last 10 years, I've given you an addendum to my brief. Because of the responses made by the government, I literally have surveyed all of the cases throughout the country, throughout the districts. And if you particularly look at the last 10 years, what you have is that you have the 8th Circuit cases that are instructing jurors that they must return a death sentence. And outside of the 8th Circuit, you've got one case in which jurors are instructed that they must return a death sentence. And 24 told that they never have to return a death sentence. The Allen interpretation is the one that the 8th Circuit does. The idea that, and it's basically that the whole thought about determining a death sentence is all tied up in the weighing of aggravating and mitigating factors. But Judge Bernice Donnell of the 6th Circuit, who at the time that she wrote her opinion, was the district judge for the Western District of Tennessee, saw the statutes in a different way. That it's a two-stage process, that it's consideration and weighing of the aggravating and mitigating factors, but then a separate determination that the death penalty is justified. And that's the position that has won the day in the vast majority of the districts throughout the country. Now, not only that, you've got the Jones holding by the United States Supreme Court, in which Justice Thomas literally quotes verbatim the language and the instructions used in that case that the jury never has to return a sentence of death. Then you've got United States versus Brown out of the 11th Circuit. And then I've just brought to the court's attention United States versus Acard. And it is not a case that is directed specifically to this issue. But it is a case in which the exact language that a jury never has to return a sentence of death is seen as one of the protections of the FDPA. And the argument is made by counsel, Mr. Valentini, that that can somehow be harmonized with Allen. And it just can't. Because Allen said you can't use the term never, because all of this is in the context of the weighing of aggravating and mitigating factors. Now, counsel, I don't like that instruction. I don't like it. I think it's confusing. I don't go as far as you and say that it tells them to return a death penalty. But I do think it's open to interpretation for the jury and people could interpret it different ways. Well, it's a 99-word run-on sentence. It is. But we're bound by prior decisions. So there's nothing this panel can do about it, right? And I get you on that. My hook for you guys is this, which is that the rule of lenity. And that's the additional issue that I've raised, which has not been addressed by the court. So that is the one way that if you're so inclined, that would not conflict with the previous holdings of the court. But the rule of lenity is not for instructions. The rule of lenity is usually for the statute of conviction, interpreting a particular word in a way that favors the defendant. I've sometimes seen it applied to sentencing statutes, but I've never seen it applied to an instruction. Well, and Judge, it's not just the instruction. The idea here is that the statute is being interpreted in two basically diametrically opposed ways so that in one part of the country, you get a heck of a lot more leniency possibilities from the jury than in our states for the Eighth Circuit. But frankly, I agree with you that it would be better determined by the court and bank. But that is the one place where the previous decisions have not looked at that particular issue. So what you've got here then is we go into the other point that I really wanted to talk to you all about. And because the instructions were as clear as they were, using the term must, it's clear that the district court erred in refusing to accept the jury's note as its determination against the death penalty. They reported that they 100% certainty that we are unable to reach a unanimous decision in regard to defendant Hall. Go through how they were instructed. You start with instruction number 18, and that's in my appendix at appendix H. That the jury unanimously concludes that the aggravators sufficiently outweigh mitigators to justify a sentence of death, and that therefore death is an appropriate sentence, the jury must record that death is to be imposed. Only if the jury gets past that point can they even consider life imprisonment. And that's in instruction number 18. Then the form of verdict, though, the jury can return a life sentence only by a unanimous verdict. Counsel, don't you have to read instruction 18 in conjunction with instruction 19? Absolutely. And that's what I'm just about to get to, Judge Price. Because then when you do that, you go to instruction number 19. And if the jury cannot unanimously agree on either of the sentences, then the district court is to make the determination. But now you've got the jury confronted with a situation that they don't have an answer to. Now, I cited to you United States versus Richardson out of the Northern District of Georgia. And they took care of that situation by basically giving a third alternative to life and death, which if they are not unanimously persuaded on the issue of the appropriate sentence. In that case, they could have done that. But that idea has been brought to the powers that be on the instructions committee by me and was rejected. So that's not one of the alternatives here. So the jury was in a position that they're not returning a unanimous verdict, obviously. But this is not a deadline either. What you've got is that this is a determination against death given by the jury in the only way that they can. Now, back in the district court and in the briefs, Lowenfield versus Phelps is brought up as supposedly countering our position. But the trouble is Lowenfield versus Phelps deals with a system of penalty phase implementation that's completely different. It's a non-weighing system. In other words, the jurors are presented aggravating factors and mitigating factors and then make the determination about death or life. And so what you've got in that situation is it's very similar to a classic situation of not guilt. And so you have the same kind of law that applies in that situation to the situation of a penalty in a non-weighing system. But this is a weighing system that we've got. And it has the steps that we've already described. And so what you've got is that the jury is making a determination, a non-death determination, that they're trying to report. Now, the government also brings up Jones versus United States. And what they are saying there is that the language there supposedly blocks us. But in that case, it was a completely speculative argument that was being made. There was no jury non-unanimity in the Jones case. There was a postulation by Jones that the jury may have not understood all of this. Counsel, I want to ask you on the note which you've referenced a couple of times. This really didn't rise even to the level of a normal Allen charge. I mean, this was really the jury comes back and says, you know, we think we're 100% deadlocked. We're not going to read. You know, this is hard stuff. And it should be hard stuff, deciding whether to put someone to death. And, you know, the district court said, you know, why don't you try again? You should continue your deliberations and try, not you must or should, you should try to reach unanimous verdicts. Didn't say guilt. Didn't say innocence. And so wasn't this in the nature just different than a lot of these other cases that, you know, have more coercive instructions to try to get the jury to reach a verdict? Absolutely, Joe Strauss. It's the mildest form of a hammer instruction that you could ever have. The trouble is, is the context. What you've got is the jury giving, trying to report that they have made a determination against death. And they're told, oops, no, we can't take that. And what I'm saying is that in that context, no matter what he said, other than, no matter what Judge Fenner said, other than accepting that determination, is leading the jury to believe they got it wrong. They misinterpreted the law. And so therefore, they've got to do something different. So are you asking us to adopt a per se rule against supplemental instructions in a capital case? Oh, heavens no, Judge. No, just the opposite. In the right set of circumstances, it makes sense. Here though, this is not, this was not a matter of confusion. This was not a jury deadlock. This was a jury determination. That's what I'm saying to you. If there is a jury deadlock, sure, you give an instruction. That's not what you had here. You actually had a jury who determined they could not have written that note. Now, what's our standard of review for your interpretation of how the judge had to have interpreted the note? How can it be anything other than it was an abuse of discretion for the judge to construe this note as a reflection of deadlock and not your take on it? Well, don't you think, Judge Loken, that it could also be a de novo thing because of the seriousness? No, I'm raising the standard of review question. I didn't mean to prejudge you. I'm sure you'd prefer de novo, but what's the basis for de novo, as you put it, given the context? Well, and I think the preferable one would be abuse of discretion. Yes. But I think that the, and that's in my brief, but honestly, I could see it. You asked me about opinion, and so I was given it. But I could see in this context that it could be a de novo, but I think we absolutely have an abuse of discretion situation here. We raise the objection. What words in the note make it only, as a matter of law, has to be interpreted your way? Judge, it's not just the note. It's in the context. The only way the jury could have come to that point, they are telling the court that they have reached the issue of life in prison. I have to ask, because you can tell I haven't studied the record. Did anyone point that out to the judge at the time? You have to construe it. Judge, if you're asking me, did I give Judge Spinner as much detail as I've given you in terms of the objections, I did not. What I said to him was that the jury's determination, that this is a jury determination, that this is not a situation where they are hung up. The situation that we've got here, though, is because of the language of the note. We know that the jury reached the question of life. They can only reach the question of life if they have decided that they cannot unanimously decide that death is justified. That's a determination against death. Does your argument rely on what you see as the confusion in the instructions, or is it freestanding? In other words, to get to Judge Loken's question, is this all about the language of the note, or does it depend on the instructions? Actually, in this case, Judge Strasse, the instructions are crystal clear. The instructions tell the jury, and just like what Judge Gross would say, the instructions tell the jury what they're going to do if they get to this point. The trouble is, there's nothing in the form of verdict that allows them to report that result. What have they got? They've got paper to write down that result, and that's what they did. It would have been... What Judge Fanner should have done is he should have accepted that. I'm out of time. I apologize. Thanks for your courtesy. Thank you. Mr. Valentini? May it please the court. I would like to begin the governor's presentation with the issue of the supplemental instruction that opposing counsel just discussed. In the district court, Hall took the position along the lines of the argument that Judge Strasse hypothesized just now, which is a per se bar on supplemental instructions under the FDPA. There is... I take some of Hall's appellate brief to renew that same argument. Isn't there some logic to that, though, in a situation where a non-yet famous verdict is permissible? There's no logic to that because the FDPA attaches specific consequences to an intractable deadlock that does not alter the district court's traditional broad discretion to discern when that deadlock has occurred for the reasons that my opposing... That opposing counsel today seemed to acknowledge, which is that there is instances in which the district court, in which a communication does not convey an intractable deadlock. Our position is under the FDPA, the fact that the consequences are different does not diminish the interest of the government and of the state in securing unanimous verdicts. That is a fundamental concern that the Supreme Court highlighted in Jones when it held that it's not required for the jury to be informed as to the consequences of a deadlock. There, the Supreme Court explained that the state, even if the consequence of a deadlock is not a mistrial, that the state still has a strong overriding interest in ensuring that the verdict reflects a unanimous decision by the jury. Insofar as there is a... Insofar as the claim is based somehow in the language of the FDPA, there is no basis for that. As for the instruction, as Your Honor also pointed out, instruction 19 makes crystal clear... Make crystal clear to the jury what the consequences of not reaching a unanimous verdict would be. That is the instruction that in Jones the Supreme Court said is not necessary, but in this case the instruction was given, so the jury had the benefit of that instruction. And the verdict form, there was some discussion about the verdict form not giving the jury an approval to record a final non-unanimous determination. Two answers to that. First, even if the jury subjectively intended to convey that determination and as in any case, the district court will retain discretion to not accept it and send the jury back to deliberate. But even aside from that, the language of the special verdict form made clear that in order to... Checking no in response to question in section 6A and then moving on and answering no to the question in section 6B of the jury verdict that asked the jury whether by unanimous decision they had decided to impose a life sentence of the defendant. So there is no basis either in the FDPA, in the jury instructions, or in the verdict form to discern any for defendant's all claim. As to the jury instruction itself, as to the context that was discussed. First of all, I think there is agreement that the content of the instruction itself was a smile. It was not an Allen instruction. That is something that this case, this court's case law in Reed, United States versus Reed, has highlighted. The instruction simply lacked the hallmark of what opposing counsel referred to as the hammer instruction. It did not invite minority jurors to re-examine their decision. And in addition to that, there was none of the other arguably coercive or potentially coercive aspects that are sometimes included in supplemental instructions. There was no reference, let alone any threat, of marathon deliberations, of sequestration, or any pressure or lecturing the jury about the potential outcomes or the potential consequences of not reaching a unanimous verdict. In fact, the instruction that was given in this case is less forceful than the supplemental instruction that was upheld by the Fifth Circuit in United States versus Fields, which is really the only Court of Appeals case that we have identified that dealt with supplemental jury instructions in the context of a death penalty FDPA case. In that case, the court simply instructed the jury to please continue deliberating. Here, the court added, and tried, Your Honor, Judge Stratton highlighted that just a minute ago, that conveys that all that was required of the jury was to make an effort. For that reason, there's also additional circumstantial evidence here that strongly suggests that, in fact, conclusively proves that there is no coercion, that the jury did not succumb to any perceived need to reach a unanimous verdict no matter what. The length of the deliberations, I think we discussed exhaustively in our brief, both after the instruction and overall. I would also point out that, importantly, after the jury received the supplemental instruction, the jury asked for three exhibits. That is the hallmark of a jury that is given in to some need to please the court with a unanimous verdict. The special verdict itself is nuanced. While it was decisive, all the aggravating factors were found unanimously, both the statutory ones and the non-statutory ones. Some jurors found some mitigating circumstances and others didn't. For all these reasons, we don't think that the really modest supplemental jury instruction that was given in this case poses any coerciveness or a statutory question. Unless your honors have any further questions about that particular issue, I will move on to some of the issues that my opponent just discussed. First of all, there was some discussion to the effect that the facts of this case as presented to the jury was not a strong case of heinousness, that the murder itself was heinous. In fact, we would submit that certainly the evidence was not only sufficient but overwhelming that this was a heinous, cruel, and depraved murder. While Duke cast into complacency, he convinced him to let himself be tied up, and then he bound his hands, tied his feet, gagged him, stuffed a rag in his mouth, and then either hauled or coons blindfolded him. What's the story on, I seem to recall, and maybe I'm just misreading it, maybe I'm confusing the amount of time that he was being choked, but on consciousness, what was the expert testimony on that? Was it more than a minute, or is opposing counsel right that he would have been conscious for only about a minute? The testimony of the expert was that it would have taken between three and five minutes for death to occur, for Caster to die because of the compression of the larynx. The expert then added that an unresolved question, a question as to which he found no evidence, which is if to the extent that the arteries in the neck had been compressed, that could have led to loss of consciousness within less than a minute. But then he also went on to say, and that's I think on page either 1730 or 1740 in the record, or thereabouts, and he also went on to say that he did not see any evidence, any of the indicia or any of the symptoms or pathology results that one would imagine would accompany that kind of deprivation of blood flow. So it could have been longer, we just don't know, in terms of consciousness. Right. It certainly could have been longer than a minute. I think the testimony is a bit stronger than that. It suggests that the absence of evidence, and this is one of those instances in which the absence of evidence suggesting that there was a deprivation of blood flow tends to support an inference that in fact there was no deprivation of blood flow. But certainly the jury was well within its discretion to draw it. I mean, this is a quintessential factual question that we ask juries to decide. Well, and then I had a conversation with opposing counsel about the stomping. My understanding of the record is there's some evidence that it wasn't merely stepping on the throat, that there was some stomping on the throat that occurred as well. And maybe that even came from the defendants themselves, or one of the defendants, I can't remember. Is there evidence in the record to that effect, or am I misremembering that? No. Defendant Hall, in a statement to the FBI, said that he stood on, and I believe that's what Your Honor is referring to, stood on 200 pounds for five to 10 minutes. Okay. So that is, just to go on on the evidence of heinousness, that is how he decided to kill Castro. It could have broken his neck. I mean, there's a lot of argument, which is frankly a little surreal, about how this is the only way he could have killed him, and that's why it's not heinous. I mean, there's certainly other ways that if Hall wanted to kill Castro, he could have done it with much less suffering. But here's, let me, before you, one of the things that bothers me about this heinousness issue, and the closeness of the case, the fact that I don't think the statute intends for every strangulation case to be heinous, and to merit the death penalty. And you know, if it truly is, you put, I mean it's awful to put your foot on somebody's neck, but if that's all there is, then maybe that's not heinous enough to warrant the death penalty, or to be an aggravating factor. What's the government's response to that? Our response to this, the stomping and the standing on the neck, is far from the only evidence in this case. As I mentioned before, there's evidence of psychological torture. They, you know, some of the factors that are considered as part of the heinousness inquiry, is whether the defendant was rendered helplessness, helpless. This is the quintessential case of that. Hall duped Castro into letting himself be tied up, bound, and then he gagged him. He blindfolded him. And then after the killing, he also visited unnecessary violence on his body. He punched him one last time in the belly. After that, and these are all factors that are relevant to the depraved nature of the killing. After the killing, Hall rejoined with other inmates, and then he took select inmates to peek through the window to Castro's cell to view the body. And as I recall, there are footprints on the chest of the victim. Is that right as well? Suggesting that the pressure was not only on the neck, it was also in other parts of the body, or am I wrong about that? It's correct. It seems like the testimony, of course, someone who's in the room, it seems like the testimony, the curvature of the prints matches Defendant Kunz's boot, not Defendant Hall, but certainly there was something on the chest. But just to be more specific, to Defendant Hall, he confessed that it stood on his neck. And to Your Honor's point, whether every strangulation killing would be heinous, that's not a question that this court really needs to resolve, because there is a constellation of evidence in addition to that, that goes to the depraved, cruel nature of the killing, in addition to its premeditated and deliberate nature as well. Opposing counsel also discussed future dangerousness. I think insofar as the claims were discussed today are purported to arise under the Constitution, the Supreme Court's decision is in Jurek, Barefoot, Simmons, foreclosed, all of those. To the extent that they're purported to be statutory claims, this court's decision in Allen is squarely on point. At page 788, Allen said that given the broad language of the FDPA, there's no reason under the FDPA why future dangerousness cannot be presented to the jury. Now, I understand there's some attempt to repackage a claim about, a concern about the stacking of a standard of proof in a future judgment as part of an inquiry. That, as we point out in our brief, that precise argument was made by the capital defendant in Jurek. The Supreme Court did not address it explicitly, but evidently rejected it when it said that determining future dangerousness may not be easy, but that's not a reason not to do it. And just more generally, as the Supreme Court pointed out, predicting future dangerousness is something that not only do the courts do every day, but jurors are asked to do every day. Your Honor pointed, for instance, to questions of mens rea. Another context in which, which we cite in our brief, which I think it's clear that jurors are asked to find beyond a reasonable doubt that a predictive judgment was, to find a predictive judgment beyond a reasonable doubt is in the context of a Pinkerton instruction, when jurors are asked to determine whether a certain crime by a co-conspirator was reasonably foreseeable. What that asks the jurors to put themselves back in time, not into the future, but to sort of put themselves back in time in the position of the defendant and make a judgment as to whether, as of that time, it was reasonable, reasonably foreseeable beyond a reasonable doubt that other co-conspirators would have committed the substantive offenses. Is there a difference between asking the jurors to determine something that's really hard to determine, somewhat predictive, but it's in the past, versus asking them to do something that is unknowable at that particular point in time because it's in the future? I mean, there is, I think, a theoretical difference. I think, if anything, I would argue that that cuts the other way because it's probably more difficult for a jury to construct a counterfactual and put themselves back in time to run a predictive judgment. But to the extent that the difference exists, I think it would cut the other way. With respect to the evidence, there was some claim that it's unclear whether my opposing counsel was saying that the evidence of the threats made by defendant hall should not have been admissible or whether they're not particularly probative. The fact of the matter is that those were threats made by someone who—death threats made by someone who eventually did carry out a murder. That shows that that is probative of the homicidal intent and resolve and bears directly on the likelihood that, if given an opportunity, defendant hall will carry out precisely the same kind of heinous acts in the future. There's also—my opposing counsel mentioned the lack of remorse, non-statutory factor that was submitted to the jury. That claim, I think my opposing counsel recognized this. That argument is squarely foreclosed by this court's decision in Perkey that said that—that held that, under the FDPA, duplication of any overlap in aggravating factor does not pose a statutory concern. Finally, as to the grave indifference mitigating factor, first of all—aggravating factor. First of all, it appears that defendant hall misconstrues what grave indifference to human life, the function that it played here. What the government offered in support of that aggravating factor is not just the conduct intent or the conduct in connection with this particular murder, but just the other conduct that defendant hall carried out, including, for example, there was a specific reference in the government submission to the violence that was visited, the assault of inmate Bonin that defendant hall carried out a few years before the murder. But even if the grave indifference aggravating factor were, in fact, tethered to the particular murder in this case, it would not give rise to any statutory problem because the FDPA—there's limits aggravating factors to factors that do not deal with intent. If anything, as we point out in our brief, the legislative history suggests exactly the opposite. There was a proposal that would have limited the use of intent factors as aggravating factors. That proposal—that is the reason why some legislators opposed the proposal, and the proposal was not included in the bill that ultimately became law. So to the extent that there is no textual basis for that restriction, and there is no basis in the legislative history either. As for, I believe, the last claim that my opponent raised was the interpretation of the shell language in the FDPA with respect to whether the jury should have been instructed that the jury is never required to impose a sentence of that. As to that claim, I think my opponent also recognized it's foreclosed by this court's holding in United States v. Allen. I would also point out that this court has since then, time and again, in Nelson, Ortiz, Rodriguez, Montgomery—all these cases are instances in which the issue was raised again and again foreclosed by this court. As to the fact whether there is a circuit conflict on the issue, all my opponent's sides are district court decisions. Those not only are not presidential, they also reflect a different judgment. They merely reflect the judgment that some district court decided, whether out of an abundance of caution or within its exercise of discretion, to give an instruction. That says nothing as to whether this instruction was required. Which is, of course, the standard of review under which any claim of instructional error would be reviewed in this court to the extent it was preserved. Unless your honors have any further questions, we will ask the court to affirm the judgment of conviction and the sentence of death in this case. Very good. Thank you. Mr. Burke. Thank you very much, gentlemen. Thank you. Very good, counsel. Once again, the case has been very well argued and thoroughly briefed, and we will take it under advisement.